Matthew C. Maclear (Bar No. 209228)
Email: mcm@atalawgroup.com
Anthony M. Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Jason R. Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
409 45th Street
Oakland, CA 94609
Phone: (415) 568-5200

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER &
INLAND EMPIRE WATERKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiffs Inland Empire Waterkeeper*
*& Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> COLUMBIA STEEL, INC., a California corporation; KRATOS EQUITY, LLC, a California limited liability company; GUSTAVO THEISEN, Trustee for the Young Family Trust Surv Tr 7 17 1992 & Theisen, Gustavo W Rev Tr 2 25 2010, <br><br> Defendants. | Civil Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeepers" or "Plaintiffs"), by and through counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On January 21, 2020, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter ("Notice Letter") to Columbia Steel, Inc. ("Columbia Steel"), Gustavo Theisen – Trustee of the Young Family Trust Surv Tr 7 17 1992 and Theisen, Gustavo W Rev Tr 2 25 2010, and Kratos Equity, LLC ("Kratos"), (collectively, "Defendants"), which is attached hereto as **Exhibit A** and incorporated by reference herein. The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 2175 N. Linden Avenue, Rialto, California 92377 ("Columbia Steel Facility" or "Facility"). The Notice Letter informed Defendants of Plaintiffs' intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.    The Notice Letter was also sent to the registered agent for Defendant, the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40

C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, USDOJ nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.      Plaintiffs seek relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.      INTRODUCTION

6.      This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from their industrial operations at 2175 N Linden Avenue, Rialto, California 92377 (the "Facility"). Specifically, Defendants' discharge of pollutants from the Facility to the MS4 system, which flows to Lytle Creek, the Santa Ana River, and the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring for at least five years from the date of the Notice Letter and are ongoing and continuous.

## III.      <u>PARTIES</u>

### A. Inland Empire Waterkeeper and Orange County Coastkeeper.

7.      Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

8.      Orange County Coastkeeper is a non-profit public benefit corporation

organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

9.     Together Inland Empire Waterkeeper and Orange County Coastkeeper ("Waterkeepers") have approximately over 1,400 members who live and/or recreate in and around the Santa Ana River watershed, including Lytle Creek. Waterkeepers are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Waterkeepers actively seek federal and state agency implementation of the Clean Water Act and, where necessary, directly initiate enforcement actions on behalf of itself, its members, and others.

10.    Waterkeepers' members use and enjoy the Santa Ana River watershed and its tributaries, including Lytle Creek, for fishing, boating, swimming, bird watching, picnicking, wading, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, including monitoring and research activities, and/or for aesthetic enjoyment.

11.    Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Santa Ana River watershed and its tributaries, and impair Waterkeepers' members' use and enjoyment of those waters.

12.    The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Waterkeepers' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Waterkeepers caused by Defendants' activities.

13.    Continuing commission of the acts and omissions alleged herein will irreparably harm Waterkeepers' members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owner and/or Operator of the Facility.**

1.      Plaintiffs are informed and believe, and thereon allege, that Columbia Steel is an active California Corporation.

2.      Plaintiffs are informed and believe, and thereon allege, that Columbia Steel, Inc. is an operator of the Facility.

3.      Plaintiffs are informed and believe, and thereon allege, that Columbia Steel has been operating the Facility for the past five years.

4.      Plaintiffs are informed and believe, and thereon allege, that Columbia Steel is an owner of the Facility.

5.      Plaintiffs are informed and believe, and thereon allege, that Columbia Steel has been an owner of the Facility for the past five years.

6.      Plaintiffs are informed and believe, and thereon allege, that the name and address of the Registered Agent for Columbia Steel is Gustavo Waldemar Theisen, located at 2175 N. Linden Avenue, Rialto, California 92377.

7.      Plaintiff refers to Columbia Steel herein as the "Facility Owner and/or Operator."

8.      Plaintiffs are informed and believe, and thereon allege, that the Facility operates on land owned by the Young Family Trust Surv Tr 7 17 1992 & Theisen, Gustavo W Rev Tr 2 25 2010.

9.      Plaintiffs are informed and believe, and thereon allege, that the trustee of the Young Family Trust Surv Tr 7 17 1992 & Theisen, Gustavo W Rev Tr 2 25 2010 is Gustavo Waldemar Theisen (the "Trustee").

10.      Plaintiffs are informed and believe, and thereon allege, that Trustee Gustavo W. Theisen is the Chief Executive Officer of Columbia Steel.

11.      Plaintiffs are informed and believe, and thereon allege, that the Trustee had knowledge and control of Columbia Steel's acts and omissions giving rise to the violations alleged in this Complaint.

12.      Plaintiffs are informed and believe, and thereon allege, that Kratos Equity

LLC ("Kratos") is also an operator of the Facility.

13.    Kratos shares a physical address with the Facility, located at 2175 N. Linden Avenue, Rialto, California 92377, and is in the business of leasing equipment.

14.    Gustavo Theisen is a manager or member of Kratos.

15.    Based on the forgoing information, Plaintiffs are informed and believe, and thereon allege, that Kratos Equity LLC is also an operator of the Facility.

16.    Columbia Steel, the Trustee, and Kratos are collectively referred to herein as "Defendants" and/or "Owners and/or Operators" of the Facility.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

17.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

18.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

19.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

20.    The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

21.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

22.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

23.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

24.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

25.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

26.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

27.    Defendants are a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

28.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

29.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $58,800 per day per

violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

30.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's Storm Water Permit.**

31.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

32.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

33.    California is a state authorized by EPA to issue NPDES permits.

34.    In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

35.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

36.    Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Plaintiffs refer to as the "1997 Permit."

37.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Plaintiff refers to as the "2015 Permit."

38.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the

1997 Permit. *See* 2015 Permit, Finding 6.

39.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 2015 Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 2015 Permit, Finding 17.

40.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 2015 Permit, Section XXI(A) (Duty to Comply).

C.    **The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

41.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* 2015 Permit, Discharge Prohibition III(B).

42.    The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* 2015 Permit, Section V(A).

43.    Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 Permit, Effluent Limitation

V(A).

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

45.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

46.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facilities.

47.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *Id*.

48.     The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 2015 Permit, Section VI(B).

49.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the 2015 Permit.

50.     The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 2015 Permit, Receiving Water Limitation VI(A).

51.     Water Quality Standards ("WQS") are pollutant concentration levels

1  determined by the State Board, the various regional boards, and the EPA to be protective
2  of the beneficial uses of the waters that receive polluted discharges.

3       52.    The State of California regulates water quality through the State Board and
4  the nine Regional Boards. Each Regional Board maintains a separate Water Quality
5  Control Plan that contains WQS for water bodies within its geographical area.

6       53.    The Water Quality Control Plan for the Santa Ana River Basin, California
7  Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011)
8  ("Santa Ana Basin Plan") identifies the "Beneficial Uses" of water bodies in the Santa
9  Ana region.

10      54.    The existing and/or potential Beneficial Uses for Lytle Creek downstream of
11  the point at which it receives storm water discharges from the Columbia Steel Facility
12  identified in the Santa Ana Basin Plan include: Municipal and Domestic Supply;
13  Agricultural Supply; Industrial Service Supply; Industrial Process Supply; Groundwater
14  Recharge; Hydropower Generation; Water Contact Recreation; Non-contact Water
15  Recreation; Cold Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or
16  Endangered Species. *See* Santa Ana Basin Plan at Table 3-1.

17      55.    Lylte Creek flows to Reach 4 of the Santa Ana River, which continues
18  through Reaches 1-3 of the Santa Ana River discharging to the Pacific Ocean. According
19  to Defendants' Storm Water Pollution Prevention Plan, Lylte Creek is approximately 3.5
20  miles to the southeast and the Santa Ana River is approximately 6 miles south.  The
21  Beneficial Uses of the Reaches 1-4 of the Santa Ana River include: Groundwater
22  Replenishment; Water Contact Recreation; Non-contact Water Recreation; Warm
23  Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species.  *See*
24  Santa Ana Basin Plan at Table 3-1.

25      56.    Surface waters that cannot support the Beneficial Uses of those waters listed
26  in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of
27  the Clean Water Act, 33 U.S.C. § 1313(d).

28

57.     According to the 2014/2016 303(d) List of Impaired Water Bodies, Santa Ana River, Reach 3 is impaired for copper and lead, and Prado Flood Control Basin, is impaired for pH.

58.     Polluted discharges from industrial sites, such as the Columbia Steel Facility which discharges pH-affecting substances; metals, such as iron, nickel, manganese, aluminum; toxic metals, such as zinc and copper; chemical oxygen demand ("COD"); Total Dissolved Solids ("TDS");Total Suspended Solids ("TSS"); N+N; carbon; phosphates; gasoline and diesel fuels; fuel additives; spent solvents; fuels; paint; solvents and oil and grease ("O&G"), each of which causes or contributes to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

59.     Discharges of pollutants at levels above WQS, like those from the Columbia Steel Facility, causes or contributes to the impairment of the Beneficial Uses of the waters receiving the discharges.

60.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

61.     The Santa Ana Basin Plan provides that "dissolved mineral content of the waters of the region, as measured by the total dissolved solids ("TDS") test ('Standard Methods for the Examination of Water and Wastewater, 16th Ed.,' 1985: 209B (180°C), p. 95), shall not exceed the specific objectives listed in Table 4-1 as a result of controllable water quality standards." *See* Santa Ana Basin Plan, 4-10.

62.     The Santa Ana Basin Plan lists Reach 4 of the Santa Ana River has a TDS water quality objective of 550 mg/L. *See* Santa Ana Basin Plan, Table 4-1

63.     The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

64.     The Santa Ana Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not

adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

65.    WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Santa Ana Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

66.    The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at:

http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

67.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitation Section VI(A) of the 2015 Permit.

**D.    The Storm Water Permit Storm Water Pollution Prevention Plan Requirements.**

68.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 2015 Permit, Section I(D) (Finding 32), Section X(C).

69.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-

generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X.

70.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 Permit, Section X.

71.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section X(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section XV.

72.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

### E.     The Storm Water Permit Monitoring Implementation Program Requirements.

73.     The Storm Water Permit requires permittees to develop and implement storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. 2015 Permit, Sections X(I) and XI.

74.     The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. See 2015 Permit, Section XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

75.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the 2015 Permit. 2015 Permit, Section XI(B).

76.     Section XI(A)(1) of the 2015 Permit requires dischargers to conduct monthly visual observations of each drainage area.

77.     Section XI(A)(2) of the 2015 Permit requires dischargers to conduct sampling event visual observations, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 2015 Permit, Section XI(A)(3).

78.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 2015 Permit, Section X(B)(1).

79.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged.

2015 Permit Section XI(B)(4).

80.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

81.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

82.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

83.     Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code.

84.     Table 1 of the 2015 Permit requires SIC code 3441, such as this facility, to analyze samples for zinc, N+N, iron, and aluminum.

85.     Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

86.     Section XI(B)(6)(f) of the 2015 Permit requires dischargers to analyze additional parameters required by the Regional Board.

87.     Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

88.     Section XVI of the 2015 requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any non-

compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

### F. The 2015 Permit Exceedance Response Actions Requirements.

89.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a Numeric Action Level ("NAL") exceedance for that same parameter. *See* 2015 Permit, Section XII(C).

90.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* 2015 Permit, Section XII(C)(1)(a)-(c).

91.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section XII(C)(1)(c).

92.     Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii).

93.     The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(iii).

94.     A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

95.     A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII(D).

96.     A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, 2015 Permit, Section XII(D).

## V.     FACTUAL BACKGROUND

### A.     The Facility's Storm Water Permit Coverage.

97.     Plaintiffs are informed and believe, and thereon allege, that on or about April 13, 2015, Columbia Steel obtained Storm Water Permit coverage for the Facility by submitting a Notice of Intent ("NOI") to the State Board.

98.     Plaintiffs are informed and believe, and thereon allege, that in the NOI, the Facility Owners and/or Operators identified the owner/operator of the Columbia Steel Facility as "Columbia Steel, Inc." located at 2175 N. Linden Ave., Rialto, California 92377.

99.    The NOI lists the Facility as 15 acres in size with 13.5 acres of industrial area exposed to storm water.

100.   The NOI states that the Facility is 25% impervious.

101.   The State Board's electronic SMARTS database, lists the current Columbia Steel Facility Waste Discharge Identification ("WDID") number as 8 36I024202.

102.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

103.   The NOI lists the SIC code for the Facility as 3441 (fabricated structural metal).

**B.    Description of Industrial Activities at the Facilities.**

104.   Plaintiffs are informed and believe, and thereon allege, that the Facility is a steel fabrication facility.

105.   Plaintiffs are informed and believe, and thereon allege, that the Facility fabricates structural steel members, where welding, cutting, and drilling takes place.

106.   Plaintiffs are informed and believe, and thereon allege, that some materials are also painted with acrylic emulsion primer.

107.   Plaintiffs are informed and believe, and thereon allege, that pollutants associated with operations at the Facility include, but are not limited to: metals (including zinc, copper, aluminum, nickel, lead, manganese, and iron); spent solvents; chemical oxygen demand; brass; hexavalent chromium; fuels; paints; other solvents; oil and grease; chromates; and other pH-affecting substances.

108.   Plaintiffs are informed and believe, and thereon allege, that a 3.5 acre portion of the Facility is used by Defendants for materials storage and parking.

109.   Plaintiffs are informed and believe, and thereon allege, that large lengths of industrial steel are stored outdoors, uncovered.

110.   Plaintiffs are informed and believe, and thereon allege, that the Facility lacks adequate cover for its steel to prevent storm water and non-storm water exposure to pollutant sources.

111.   Plaintiffs are informed and believe, and thereon allege, that the Facility also handles, uses and stores paint, diesel fuel, lubricating and hydraulic oils and welding supplies.

112.   Plaintiffs are informed and believe, and thereon allege, that the storage and maintenance of vehicles and equipment, storage of materials, and industrial activities occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

113.   Plaintiffs are informed and believe, and thereon allege, that trucks and vehicles on-site track sediment, dirt, fugitive dust, oil and grease, metal particles, and other pollutants off-site.

114.   Plaintiffs are informed and believe, and thereon allege, that the Facility also discharges non-storm water process waters from equipment washing, dust suppression, and other activities as part of its industrial operations.

115.   Plaintiffs are informed and believe, and thereon allege, the Facility's Owners' and/or Operators' failures to develop and/or implement required BMPs result in the exposure of pollutants associated with their industrial activities to precipitation, and result in the Facility's discharge of polluted storm water into Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

116.   Plaintiffs are informed and believe, and thereon allege, the Facility's Owners' and/or Operators' failures to develop and/or implement required BMPs also result in discharges of prohibited non-storm water in violation of the Storm Water Permit and the Clean Water Act.

117.   Plaintiffs are informed and believe, and thereon allege, that the activities and/or areas listed in paragraphs 104-114 are industrial activities and/or areas of industrial activity at the Facilities.

**C.     Defendant's SWPPP and MIP for the Facility.**

118.   The SWPPP and MIP are publicly available for the Columbia Steel Facility via the SMARTS database and are dated March 1, 2017.

119.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP and MIP referenced in paragraph 118 is the current SWPPP and MIP for the Facility.

**D.     Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

120.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

121.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas at the Facility include, but are not limited to the activities described in paragraphs 104-114.

122.   SWPPP Sections entitled: "Facility Description," and "Description of Potential Pollutant Source" provide brief descriptions of the areas where industrial activities are conducted at the Facilities.

123.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP for the Facility does not include all areas of industrial activity at the Facilities.

124.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP for the Facility does not adequately describe all industrial processes at the Facility.

125.   Plaintiffs are informed and believe, and thereon allege, that a Columbia Steel site map  ("Site Map") was uploaded to SMARTS on August 10, 2015, and that the Site Map is a map of the Columbia Steel  Facility submitted pursuant to Section II(B)(3)(a) of the 2015 Permit.

126.   Plaintiffs are informed and believe, and thereon allege, that the Site Map does not identify all areas of industrial activity at the Columbia Steel Facility.

127.   Plaintiffs is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without adequate cover to prevent storm water exposure to pollutant sources.

128.   Plaintiffs are informed and believe, and thereon allege, that industrial activities occur throughout the Facility outdoors without adequate secondary containment measures designed to prevent polluted storm water from discharging from the Facility.

129.   Plaintiffs are informed and believe, and thereon allege, that because the Facility's SWPPP fails to describe all of the industrial activities, the Facility's SWPPP also fails to describe all of the significant materials and processes that are related to the industrial activities at the Facility.

130.   Plaintiffs are informed and believe, and thereon allege, that because all significant materials have not been identified, the Facility's SWPPP fails to describe the locations where the materials are stored, received, shipped, and handled, or the typical quantities and frequency of significant materials at the Facility.

131.   The Columbia Steel Facility's SWPPP section entitled "Description of Potential Pollutant Sources," identifies potential pollutants associated with the industrial activities at the Facility

132.   Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe all of the pollutants associated with the industrial activities at the Facilities.

133.   Plaintiffs are informed and believe, and thereon allege, that the Owner and/or Operator of the Facility have failed and continue to fail to adequately assess pollutants associated with potential pollutant sources at the Facility.

134.   Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP does not include an adequate assessment of pollutants associated with potential pollutant sources at the Facility.

135.   Plaintiffs are informed and believe, and thereon allege, that pollutants associated with industrial activities and areas the Facilities include, but are not limited to: pH-affecting substances; metals, such as iron, nickel, manganese, aluminum; toxic metals, such as zinc and copper; COD; TDS; TSS; N+N; carbon; phosphates; gasoline and diesel fuels; fuel additives; spent solvents; fuels; paint; solvents and O&G.

136.   The Columbia Steel Facility's SWPPP sections entitled: "Control Measures & Non-Structural BMPs" and "Control Measures & Structural BMPs" identify the BMPs for the areas of industrial activity at the Facility.

137.   The Columbia Steel Facility's SWPPP section entitled: "Description of Potential Pollutant Sources" includes a brief assessment of "Potential Pollutant Sources" at the Facility.

138.   Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the discharges from the Facility.

139.   Plaintiffs are informed and believe, and thereon allege, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

140.   Plaintiffs are informed and believe, and thereon allege, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not implemented all appropriate BMPs.

141.   Plaintiffs are informed and believe, and thereon allege, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

142.   Plaintiffs are informed and believe, and thereon allege, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not implemented all appropriate BMPs.

143.   Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP does not include an adequate assessment of potential pollutant sources at the Facility.

144.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to assess the BMPs at the Facility corresponding to potential pollutant sources and associated pollutants.

145.   Plaintiffs are informed and believe, and thereon allege, that the Facility's

1   SWPPP does not include an adequate assessment of the BMPs at the Facility

2   corresponding to potential pollutant sources and associated pollutants.

3       146.   Plaintiffs are informed and believe, and thereon allege, that the Facility

4   Owner and/or Operator has failed and continues to fail to assess potential pollutant

5   sources at the Facility.

6       147.   Plaintiffs are informed and believe, and thereon allege, that the Facility

7   SWPPP does not include an adequate description of the BMPs at the Facility.

8       148.   Plaintiffs are informed and believe, and thereon allege, that the Facility

9   Owner and/or Operator has failed and continues to fail to analyze the effectiveness of the

10  BMPs at the Facility.

11      149.   Plaintiffs are informed and believe, and thereon allege, that the Facility's

12  SWPPP do not include an adequate analysis of the effectiveness of the BMPs at the

13  Facility.

14      150.   Plaintiffs are informed and believe, and thereon allege, that storm water

15  sampling at the Facility demonstrates that the Facility's storm water discharges from the

16  Facility contain concentrations of pollutants above EPA Benchmarks, including, but not

17  limited to: aluminum, iron, zinc, copper, N+N, and TSS.

18      151.   Plaintiffs are informed and believe, and thereon allege, that the repeated and

19  significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or

20  Operator failed and continue to fail to develop BMPs to prevent the exposure of

21  pollutants to storm water, and to prevent discharges of polluted storm water from the

22  Facility.

23      152.   Plaintiffs are informed and believe, and thereon allege, that the repeated and

24  significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or

25  Operator failed and continue to fail to implement BMPs to prevent the exposure of

26  pollutants to storm water, and to prevent discharges of polluted storm water from the

27  Facility.

28      153.   Plaintiffs are informed and believe, and thereon allege, that the Facility

Owner and/or Operator has failed and continue to fail to adequately revise the Facility's SWPPP.

**E.    Discharge Locations at the Facility.**

    **a.  Discharge Locations at the Columbia Steel Facility.**

154.   The Facility Owner and/or Operator states that the Columbia Steel Facility's industrial storm water is discharged from a single unnamed discharge location, located at the southeast corner of the Facility.

155.   The attachment to the Columbia Steel  Facility's SWPPP is the Site Map, identified in the SWPPP as Attachment 2, illustrating the direction of sheet flow from the northwest (upper left on the map) to the southeast (lower right on the map) with an unidentified notch in the location described in the SWPPP to be Columbia Steel's discharge location.

156.   The Facility Owner and/or Operator identifies an additional portion of the Facility used for parking and material storage without providing the discharge location for that drainage area.

157.   Plaintiffs are informed and believe, and thereon allege, that there is more than one discharge location at the Columbia Steel Facility.

**F.    The Discharges from the Facility to the Receiving Waters.**

158.   Plaintiffs are informed and believe, and thereon allege, that the storm water discharging from the Columbia Steel Facility flows into the County of San Bernardino and City of Rialto storm drains system (collectively, "municipal separate storm sewer system" or "MS4").

159.   Plaintiffs are informed and believe, and thereon allege, that the polluted storm water from the Columbia Steel Facility discharges from the MS4 to Lytle Creek and Reaches 3 and 4 of the Santa Ana River.

160.   Plaintiffs are informed and believe, and thereon allege, that the polluted storm water from the Columbia Steel Facility discharges from the Santa Ana River to the Pacific Ocean at Huntington Beach State Beach.

161.   Plaintiffs are informed and believe, and thereon allege, that each of the receiving waters described in paragraphs 159 and 160 are waters of the United States.

**G.   Non-Storm Water Discharges.**

162.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

163.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges are ongoing and will continue until the Facility Owner and/or Operator develop and implement BMP's that prevent prohibited on-storm water discharges or obtain separate NPDES permit coverage.

164.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges occur as a result of dust suppression and/or washing and cleaning activities at the Columbia Steel Facility.

165.   The Facility Owner and/or Operator conducts the activities described at above without BMPs to prevent related non-storm water discharges.

166.   Non-storm water discharges resulting from the activities described at above are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the Storm Water Permit.

**H.   Defendant's Sampling, Monitoring, and Reporting.**

167.   The Columbia Steel Facility's SWPPP states that the SWPPP's Monitoring Program satisfies the permit's requirement for a Monitoring Implementation Plan (MIP).

168.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to conduct and record adequate visual observations of storm water discharges since Facility obtained permit coverage on or about April 13, 2015.

169.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to conduct and record all required monthly visual observations at the Facility.

170.   Columbia Steel's SWPPP section entitled Monitoring Program constitutes the "Sampling Program" for the Facility.

171.   The SWPPP Monitoring Program section identifies O&G, TSS, pH, zinc, nitrate and nitrite, TDS, iron and aluminum as the sampling requirements at the Facility.

172.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities at the Facility result in the discharge of storm water containing copper to receiving waters impaired for copper, contributing to the degradation of water quality.

173.   Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to require that the Facility Owner and/or Operator analyze storm water discharges from the Facility for all required parameters by failing to specify that storm water discharges will be analyzed for copper.

174.   Plaintiffs are informed and believe, and thereon allege, that the MIP for the Facility fails to that require the Facility Owner and/or Operator collect storm water samples from all discharge locations at the Facility from all storm water discharges occurring during qualifying storm events.

175.   Via the SMARTs database, Plaintiffs obtained an Annual Report for the Columbia Steel Facility dated June 21, 2016.

176.   Plaintiffs are informed and believe, and thereon allege, that the Annual Report dated June 21, 2016, obtained from the Regional Board is the 2015/2016 Annual Report for the Columbia Steel Facility.

177.   Via the SMARTS database, Plaintiffs obtained an Annual Report for the Columbia Steel Facility dated July 7, 2017.

178.   Plaintiffs are informed and believe, and thereon allege, that the Annual Report dated July 7, 2017, obtained from the Regional Board is the 2016/2017 Annual Report for the Columbia Steel Facility.

179.   Via the SMARTS database, Plaintiffs obtained an Annual Report for the Columbia Steel Facility dated July 13, 2018.

180.   Plaintiffs are informed and believe, and thereon allege, that the Annual

Report dated July 13, 2018, obtained from the Regional Board is the 2017/2018 Annual Report for the Columbia Steel Facility.

181.   Via the SMARTS database, Plaintiffs obtained an Annual Report for the Columbia Steel Facility dated August 8, 2019.

182.   Plaintiffs are informed and believe, and thereon allege, that the Annual Report dated August 8, 2019, obtained from the Regional Board is the 2018/2019 Annual Report for the Columbia Steel Facility.

2015/2016 Reporting Year

183.   Plaintiffs are informed and believe, and thereon allege, that the presence of high concentrations of pollutants above EPA benchmarks during the only sample collected during the 2015/2016 reporting year demonstrate that the Facility's BMPs did not and continue to not adequately address existing potential pollutant sources.

184.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facilities storm water discharges in significant quantities, such as copper during the 2015/2016 reporting year.

185.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2015/2016 reporting year.

186.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all monthly visual observations during the 2015/2016 reporting year.

187.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all storm water visual observations during the 2015/2016 reporting year.

188.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2015/2016 Annual Report.

189.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2015/2016 Annual Report.

<u>2016/2017 Reporting Year</u>

190.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facilities storm water discharges in significant quantities, such as copper during the 2016/2017 reporting year.

191.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all monthly visual observations during the 2016/2017 reporting year.

192.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all storm water visual observations during the 2016/2017 reporting year.

193.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator entered Level 1 status for TSS, Iron, Aluminum, and Zinc based on the storm water sample collected in the 2015/2016 reporting year, but failed to prepare and/or submit to via SMARTS a Level 1 ERA evaluation and Level 1 ERA report. Further, the Facility Owner and/or Operator failed to update the SWPPP to reflect the Level 1 status and describe additional BMPs for each parameter that exceeded a NAL.

194.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2016/2017 Annual Report.

195.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's certification of compliance in the 2016/2017 Annual Report was false because it failed to comply with each of the requirements of the 2015 Permit.

196.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2016/2017 Annual Report.

2017/2018 Reporting Year

197.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2017/2018 reporting year.

198.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all monthly visual observations during the 2017/2018 reporting year.

199.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all storm water visual observations during the 2017/2018 reporting year.

200.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator entered Level 2 status for TSS, iron, aluminum, and zinc as demonstrated by the storm water samples collected during the 2016/2017 reporting year.

201.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to prepare and/or submit via SMARTS a Level 2 ERA Action Plan and Level 2 ERA Technical Report as required by the 2015 Permit. Further, the Facility Owner and/or Operator failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded a NAL.

202.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2017/2018 Annual Report.

203.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's certification of compliance in the 2017/2018 Annual Report was false because it failed to comply with each of the requirements of the 2015 Permit.

204.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2017/2018 Annual Report.

2018/2019 Reporting Year

205.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2018/2019 reporting year.

206.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all monthly visual observations during the 2018/2019 reporting year.

207.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all storm water visual observations during the 2018/2019 reporting year.

208.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator entered Level 2 status for TSS, iron, aluminum, and zinc as demonstrated by the storm water samples collected during the 2016/2017 reporting year, and never entered back into Baseline status during the 2017/2018 reporting year.

209.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to prepare and/or submit via SMARTS a Level 2 ERA Action Plan and Level 2 ERA Technical Report as required by the 2015 Permit. Further, the Facility Owner and/or Operator failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded a NAL.

210.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2018/2019 Annual Report.

211.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's certification of compliance in the 2018/2019 Annual Report was false because it failed to comply with each of the requirements of the 2015 Permit.

212.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2018/2019 Annual Report.

<u>2019/2020 Reporting Year</u>

213.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2019/2020 reporting year.

214.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all monthly visual observations during the 2019/2020 reporting year.

215.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to conduct and/or record all storm water visual observations during the 2019/2020 reporting year.

216.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator entered Level 2 status for TSS, iron, aluminum, and zinc as demonstrated by the storm water samples collected during the 2016/2017 reporting year, and never entered back into Baseline status during the 2019/2020 reporting year.

217.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator failed to prepare and/or submit via SMARTS a Level 2 ERA Action Plan and Level 2 ERA Technical Report as required by the 2015 Permit. Further, the Facility Owner and/or Operator failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded a NAL.

218.   Plaintiffs are informed and believe, and there on allege, that the Facility Owner and/or Operator are in continuous and ongoing violation of the terms of the 2015 Permit described herein.

# VI.      CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

### (Alleged against all Defendants)

219.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

220.   Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

221.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

222.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

223.   The Facility Owners and/or Operators violated, violate and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

224.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

225.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

226.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

227.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

228.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

229.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

230.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

231.   Plaintiffs are informed and believe, and thereon allege that, , within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to

discharge each time storm water discharges from the Facility.

232. The Facility Owner and/or Operator violated, violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

233. Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violated and violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and such violations are ongoing and continuous.

234. Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

235. By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

236. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

237. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs prays for judgment against Defendants as set forth hereafter.

**THIRD CAUSE OF ACTION**

**Defendants' Discharges of Non-Storm Water in Violation of the
Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

238.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

239.   Plaintiffs are informed and believe, and thereon allege that, within the applicable statute of limitations, prohibited non-storm water discharges have discharged and continue to discharge from the Facility, in violation of the Storm Water Permit and/or CWA Section 301(a). 33 U.S.C. § 1311(a).

240.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators violated and violated the Discharge Prohibitions of the Storm Water Permit, within the applicable statute of limitations, and such violations are ongoing and continuous.

241.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

242.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

243.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

244.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

1  hereafter.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollution Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

245.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

246.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

247.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators has failed and continues to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

248.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Facility Owners and/or Operators has failed and continues to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

249.   The Facility Owners and/or Operators have been in violation of the Storm Water Permit at the Facility every day from July 1, 2015, to the present.

250.   The Facility Owners' and/or Operators violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

251.   The Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Facility Owners and/or Operators fails to adequately develop, implement, and/or revise the SWPPPs for the Facilities.

252.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

253.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

254.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

255.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs prays for judgment against the Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

256.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

257.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

258.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water

Permit.

259.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

260.   The Facility Owners and/or Operators have been in violation of the Storm Water Permit monitoring requirements at the Facility every day from July 1, 2015 to the present.

261.   The Facility Owners' and/or Operators' violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

262.   The Facility Owners and/or Operators will continue to be in violation of Section XI of the 2015 Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

263.   Each and every violation of the Storm Water Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

264.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

265.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

266.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs prays for judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

### Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

267.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

268.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owner and/or Operator's 2015/2016 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

269.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators' 2016/2017 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

270.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Facility Owners and/or Operators' 2017/2018 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

271.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Facility Owners and/or Operators' 2018/2019 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

272.   The Facility Owners and/or Operators have been in violation of Section XVI of the 2015 Permit and the CWA every day since at least July 1, 2015.

273.   The Facility Owner and/or Operator's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

274.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

275.   An action for injunctive relief under the CWA is authorized by Section

505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

276.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

## VII.   RELIEF REQUESTED

277.  Plaintiffs respectfully request that this Court grant the following relief:

a.   A Court order declaring the Defendants to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failure to develop and implement and adequate SWPPP, for failure to develop and implement an adequate MIP, for failure to submit accurate annual reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit.

b.   A Court order enjoining Defendants from discharging pollutants without an NPDES permit;

c.   A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

278.  A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $58,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

1
2
3

     d.    A Court order awarding Plaintiffs their reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and,

4
5

     e.    Any other relief as this Court may deem appropriate.

6

Dated: June 11, 2020              Respectfully submitted,

7
8
9
10
11
12

                        /s/Matthew C. Maclear
           By:  Matthew C. Maclear
                Attorney for Plaintiffs
                Inland Empire Waterkeeper
                Orange County Coastkeeper

13
14
15
16

                        /s/Jason R. Flanders
           By:  Jason R. Flanders
                Attorney for Plaintiffs
                Inland Empire Waterkeeper
                Orange County Coastkeeper

17
18

I attest to all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

19
20
21

                        /s/Jason R. Flanders
           By:  Jason R. Flanders

22
23
24
25
26
27
28